No. 25-1919 REDACTED

# In The United States Court of Appeals For the Ninth Circuit

TRACY HOWARD, ADINA RINGLER, & TRECEE ARTIS
*Plaintiffs-Appellants,*

v.

HAIN CELESTIAL GROUP, INC.,
*Defendant-Appellee.*

On Appeal from the United States District Court for the Northern District of California, Honorable Vince Chhabria, presiding

## OPENING BRIEF FOR PLAINTIFFS-APPELLANTS

SETH A. SAFIER
HAYLEY A. REYNOLDS
GUTRIDE SAFIER LLP
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 639-9090

MATTHEW T. MCCRARY
GUTRIDE SAFIER LLP
4450 Arapahoe Ave., Suite 100
Boulder, CO 80303
(214) 502-2171

*Attorneys for Plaintiffs-Appellants*

No. 25-1919

TABLE OF CONTENTS

I. INTRODUCTION ..... 1
II. STATEMENT OF JURISDICTION ..... 7
III. ISSUES PRESENTED ..... 7
IV. STATEMENT OF THE CASE ..... 8
A. The Regulatory Framework ..... 9
B. The Products Are Labeled with Nutrient Content Claims. ..... 11
C. The Products Are Intended Specifically for Children Under Two. ... 11
D. Plaintiffs' Claims ..... 13
E. The District Court's Decisions ..... 13
1. Decision on Class Certification ..... 13
2. Decision on Summary Judgment ..... 16
V. SUMMARY OF ARGUMENT ..... 18
VI. STANDARD OF REVIEW ..... 21
VII. ARGUMENT ..... 23
A. Plaintiffs Presented Issues of Material Fact that Preclude Summary Judgment. ..... 23
2. Plaintiffs' Evidence Established a Triable Issue of Fact ..... 30
B. The District Court Erred in Denying Class Certification ..... 36
1. Plaintiffs' UCL Unlawful Prong Claim Meets the Requirements for Class Certification. ..... 37
2. The District Court Abused Its Discretion by Holding that Deception Was a Required Element of Proof. ..... 41
3. The District Court Abused Its Discretion by Requiring an Inference of Reliance on Behalf of Unnamed Class Members 45
4. The District Court Abused Its Discretion by Holding That Plaintiff's Class Was Over Broad ..... 47
5. The District Court Doubled Down on These Errors In Denying Plaintiff's Motion for Reconsideration ..... 48
6. The District Court Abused Its Discretion by Refusing to Certify a Narrower Class. ..... 51

C. The District Court Erred by Finding that Plaintiffs Did Not Have Standing to Pursue Injunctive Relief................................................ 53

VIII. CONCLUSION ......................................................................................... 56

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................ 20, 22, 36

*Ang v. Bimbo Bakeries USA, Inc.*,
No. 13-cv-01196-WHO, 2014 U.S. Dist. LEXIS 34443
(N.D. Cal. Mar. 13, 2014)........................................................................ 45

*Bruton v. Gerber Prods. Co.*,
No. 12-CV-02412-LHK, 2014 U.S. Dist. LEXIS 175601
(N.D. Cal. Dec. 18, 2014)........................................................................ 42

*Bruton v. Gerber Prods.*
*Co.*, No. 15-15174, 2017 U.S. App. LEXIS 12833
(9th Cir. July 17, 2017)........................................................................ passim

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
20 Cal. 4th 163 (1999) ........................................................................ 37

*Cnty. of Riverside v. McLaughlin*,
500 U.S. 44 (1991)........................................................................ 6, 55, 56

*Davidson v. Kimberly-Clark Corp.*,
889 F.3d 956 (9th Cir. 2018) ........................................................................ 23, 53, 54

*De Keczer v. Tetley USA, Inc.*,
No. 5:12-CV-02409-EJD, 2014 U.S. Dist. LEXIS 121465
(N.D. Cal. Aug. 28, 2014) ........................................................................ 44

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)........................................................................ 37

*Farm Raised Salmon Cases*,
42 Cal. 4th 1077 (2008) ........................................................................ 38

*Friedman v. AARP, Inc.*,
855 F.3d 1047 (9th Cir. 2017) ........................................................................ 38

*Gitson v. Trader Joe's* Co.,
No. 13-cv-01333-WHO, 2013 U.S. Dist.
LEXIS 144917 (N.D. Cal. Oct. 4, 2013) ........................................................................ 44

*Goffney v. Becerra*,
995 F.3d 737 (9th Cir. 2021) .................... 24

*Gonzales v. Oregon*,
546 U.S. 243 (2006).................... 28

*In re Tobacco II Cases*,
46 Cal. 4th 298 (2009) .................... passim

*Interstellar Starship Servs. v. Epix, Inc.*,
184 F.3d 1107 (9th Cir. 1999) .................... 21, 22

*King v. Burwell*,
576 U.S. 473 (2015).................... 24

*Kisor v. Wilkie*,
588 U.S. 558 (2019).................... passim

*Kitchen v. Blue Diamond Growers Imaged*,
No. 37-2022-00043885-CU-BT-CTL, 2023 Cal. Super. LEXIS 60110
(Sup. Ct. San Diego Aug. 11, 2023) .................... 44

*Klein v. Chevron U.S.A., Inc.*,
137 Cal. Rptr. 3d 293 (Cal. Ct. App. 2012) .................... 38

*Kwikset Corp. v. Superior Court*,
51 Cal. 4th 310, (2011) .................... 50

*L.A. Mem'l Coliseum Com. v. Insomniac, Inc.*,
233 Cal. App. 4th 803 (2015) .................... 43, 44

*Lytle v. Nutramax Labs., Inc.*,
114 F.4th 1011 (9th Cir. 2024) .................... 40, 41

*Messner v. Northshore University HealthSystem*,
669 F.3d 802 (7th Cir. 2012) .................... 53

*Minnick v. Comm'r*,
796 F.3d 1156 (9th Cir. 2015) .................... 23, 24

*Morgan v. Wallaby Yogurt Co.*,
No. 13-cv-00296-WHO, 2013 U.S. Dist. LEXIS 144959
(N.D. Cal. Oct. 4, 2013).................... 45

*Noohi v. Johnson & Johnson Consumer Inc.*,
2025 U.S. App. 24 LEXIS 18547 (9th Cir. 2025) .................... 40, 41

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
31 F.4th 651 (9th Cir. 2022) .................... 48, 49, 52, 53

*Pakootas v. Teck Cominco Metals, Ltd.*, 8
30 F.3d 975 (9th Cir. 2016) .......... 24

*Pauley v. BethEnergy Mines, Inc.*,
501 U.S. 680 (1991) .......... 24

*Rahman v. Mott's LLP*,
No. CV 13-3482 SI, 2014 U.S. Dist. LEXIS 11767
(N.D. Cal. Jan. 29, 2014) .......... 45

*Ries v. Ariz. Bevs. USA LLC*,
287 F.R.D. 523 (N.D. Cal. 2012) .......... 54, 55

*Rubio v. Capital One Bank*, 613 F.3d 1195 (9th Cir. 2010) .......... 37

*Shaeffer v. Califia Farms, LLC*,
44 Cal. App. 5th 1125 (2020) .......... passim

*Smith v. State Farm Mut. Auto. Ins. Co.*,
93 Cal. App.4th 700 (2001) .......... 37, 38

*Stearns v. Ticketmaster Corp.*,
655 F.3d 1013 (9th Cir. 2011) .......... passim

*Steroid Hormone Prod. Cases*,
181 Cal. App. 4th 145 (2010) .......... passim

*Swearingen v. Yucatan Foods, L.P.*,
No. C 13-3544 RS, 2014 U.S. Dist. LEXIS 18094
(N.D. Cal. Feb. 7, 2014) .......... 45

*United States v. Korotkiy*,
118 F.4th 1202 (9th Cir. 2024) .......... 25

*Wang v. Massey Chevrolet*,
97 Cal.App. 4th 856 (2002) .......... 37

*Wolin v. Jaguar Land Rover N. Am., LLC*,
617 F.3d 1168 (9th Cir. 2010) .......... 22

*Yokoyama v. Midland Nat'l Life Ins*. Co.,
594 F.3d 1087 (9th Cir. 2010) .......... 22, 23, 37

**Statutes**

28 U.S.C. § 1291 .......... 7

28 U.S.C. § 1332 .......... 7

28 U.S.C. § 1441 .......... 7
28 U.S.C. § 1446 .......... 7
28 U.S.C. § 1453 .......... 7
Cal. Bus. & Prof. Code § 17203 .......... 39

**Other Authorities**

Dictionary.com, https://www.dictionary.com/browse/specifically
Specifically .......... 25

Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/specifically
Specifically specifically .......... 25

**Rules**

Fed. R. Civ. P. 23(b)(2) .......... 6, 14, 21
Fed. R. Civ. P. 23(b)(3) .......... 37, 48

**Regulations**

21 C.F.R. § 101.13(b) .......... 10
21 C.F.R. § 101.13(b)(3) .......... passim
21 C.F.R. § 101.13(c) .......... 10, 11
21 C.F.R. § 101.13(i)(3) .......... 39
21 C.F.R. §101.60(c)(2) .......... 43, 51
56 Fed. Reg. 60421 .......... 10
58 Fed. Reg. 2206 .......... 10
58 Fed. Reg. 2211 .......... 10
58 Fed. Reg. 2302 .......... 10, 26
58 Fed. Reg. 2304 .......... 26
58 Fed. Reg. 2305 .......... 10

# I. INTRODUCTION

Plaintiffs appeal the district court's grant of summary judgment in favor of Defendant-Appellee, Hain Celestial Group, Inc. ("Defendant" or "Hain") and the district court's denial of class certification. Defendant prominently advertises its Earth's Best brand baby food products with various front-label nutrient content claims such as "3g Plant Protein," "4G PROTEIN per serving" and "Excellent source of Calcium, Vitamins C & D" (the "Products). However, FDA regulations explicitly provide that "no nutrient content claims may be made on food intended specifically for use by infants and children less than 2 years of age." 21 C.F.R. § 101.13(b)(3). California, through the Sherman Food and Drug Law (the "Sherman Law"), has adopted an identical state-law prohibition and given injured consumers a private right to enforce that prohibition via the Unfair Competition Law ("UCL"). Plaintiffs, who bought Hain's products because the nutrient content claims led them believe the Products were healthier choices for their young children, brought a claim for unlawful food labeling under this state law regime.

The district court granted summary judgment based on its idiosyncratic interpretation of the at-issue regulation. The court interpreted "intended specifically" to mean "intended primarily" based on language in the Federal Register. This was an error—even the district court observed that its own conclusion was "odd" and "far from the most obvious reading" of the regulation. The district court reached its

"odd" result because it decided not to employ the basic legal toolkit, as required. Had it done so, it would not have reached the federal register language that it used to supplant the regulation's language. The plain meaning is clear: "specifically" has an ordinary dictionary definition of "in a definite or precise manner." In this context, that means that so long as there are clear, definite, and precise indications that the Product is intended for use by children under two, the prohibition applies against nutrient content claims, regardless of whether it is intended "primarily" for use by children under two or not. In other words, so long as the Products' use by children under two was not incidental, i.e., was part of the manufacturer's specific intent for the Products, then the prohibition applies.

Rather than consider this plain meaning or the lack of ambiguity, the district court jumped straight to the federal register and manufactured ambiguity and oddity. It erroneously considered commentary in which the FDA responded to a comment criticizing the regulation as allowing nutrient content claims on products "primarily intended" for adults and older children but that are still advertised for children under two. The FDA responded by saying that even if such products did not violate § 101.13(b)(3), promoting use for younger children would still be misleading under section 403(r) of the act and, in so doing, parroted the question's "primarily intended" language in its answer. The district court took this to mean that the FDA had used the federal register to replace the word "specifically" in the regulation with

"primarily." The FDA could not and did not do so, however, and the district court's reliance on this one excerpt from the federal register to change the plain meaning of an unambiguous regulation violates the Supreme Court's edicts in *Kisor v. Wilkie*, 588 U.S. 558 (2019). Indeed, even the district court acknowledged that its definition of the term was "weird" and that Plaintiffs "would get to go to trial (or would maybe even win summary judgment)" if it had not changed the regulation to prohibit claims on products "intended primarily for" children under two. 1-ER-4.

It is clear that the Products are intended *specifically* for children under two because there are *definite* and *exact* indications that the Products were designed with children under two in mind. For example, the pouch Products are all pureed fruits, vegetables, and meats; typically highly appealing and even necessary for children under two to eat, but not typical or appealing for older children and adults. They also come in 4-4.5 oz *pouches*, the perfect sizing for a young toddler; have *a spout that mimics a bottle*—hardly a design feature specific to older children or adults; and are sold in *the baby food aisle*. Hain's internal marketing documents confirm that these Products are intended specifically for use by children under two. Plaintiffs presented the district court with 30+ presentations made to retailers in which Hain identified the Products as being intended for children 9+ months and/or 12+ months.

Despite this evidence, the district court relied on its interpretation of the regulation to mean "primarily" and granted summary judgment for Hain. It did so

on a single piece of evidence: in small font on the back label, the Products include the disclaimer "For ages 2+." The district court erred. Thus, summary judgment was not appropriate.

Prior to summary judgment, the district court also improperly denied Plaintiffs' motion for class certification with prejudice. Plaintiffs sought to certify a class of all persons in California who purchased Products that contained nutrient content claims from January 26, 2018 to the present to pursue a claim under the UCL unlawful prong. Given that the two central questions for that claim—(1) whether the Defendant's labeling violated the regulation, and (2) whether Defendant "may have acquired" more money from class members "by means of" this unlawful conduct, are necessarily common, Plaintiffs' certification motion should have been granted. *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 155 (2010). But the district court denied it, holding that Plaintiffs' proposed class was "overbroad." In doing so, it committed at least three errors.

The district court's first error was to conflate Plaintiffs' UCL *unlawful prong* claim with a UCL *fraudulent prong* claim, holding that since the "whole point of a misbranding law is to prevent people from being misled . . . [t]he plaintiffs' unlawful-prong claim is thus substantively similar to their fraud claims." 1-ER-14. From that premise, the district court erroneously concluded that Plaintiffs needed to show consumer deception even on the unlawfulness claim, and that since "those who

bought the products for children two and up could not have been misled," the "proposed class" of all purchasers (instead of only those who purchased for a child under two) was "overbroad."[1] 1-ER-14. But this Court previously rejected virtually identical reasoning on identical claims relating to very similar baby food products. *Bruton v. Gerber Prods. Co.*, No. 15-15174, 2017 U.S. App. LEXIS 12833, at *6 (9th Cir. July 17, 2017). As this Court explained, proof of consumer deception is required for a UCL *unlawful* prong claim only where *the predicate violation* requires such proof. *Id.* And since § 101.13(b)(3) requires *no proof* of such consumer deception, neither does a UCL unlawful prong claim predicated on that regulation. *Id.* In short, Defendant's labels were unlawful regardless of who was purchasing the Products and regardless of whether anyone was misled, which means that *all* purchasers are entitled to restitution of the price premium they paid due to that *unlawful conduct*—not just those who were "*deceived*."[2]

The district court's second error was to hold that Plaintiffs were obligated to establish an inference of reliance on behalf of absent class members. 1-ER-14. But this violated clear, black letter law from both this Court and the California Supreme Court holding that the UCL does not require absent class members to make *any*

[1] It further refused to allow any narrowing of the proposed class—i.e., to purchases for children under two.

[2] Plaintiffs also brought fraud-based claims challenging the labels as separately misleading. The district court's refusal to certify those claims was also erroneous, but Plaintiffs appeal solely the district court's decision on the UCL unlawful claim.

*showing of reliance*. *In re Tobacco II Cases*, 46 Cal. 4th 298, 320 (2009); *Stearns v. Ticketmaster Corp*., 655 F.3d 1013, 1020 (9th Cir. 2011). It is true that *named plaintiffs* in a class action must show that they relied on a challenged label statement, i.e., that it was a "substantial factor" in their purchasing decisions, to establish that they lost money "as a result of" an unlawful label. *Id.* But those same requirements do not apply to absent class members. *Id.*

And finally, the district court erred when it held that Plaintiffs did not have standing to pursue injunctive relief and denied certification of a Rule 23(b)(2) class. Here, the district court reasoned that Plaintiffs could not show a likelihood of being deceived again due to a disclaimer on the back label of the Products. But to have standing to seek injunctive relief under Plaintiffs' *unlawfulness* claim, they do not need to show a likelihood of being *misled* again, simply that the claims would cause an economic injury again should they unlawfully remain on the labels. The district court further held that standing was lacking since the Plaintiffs' children are now all over two years old. Again, the unlawfulness of the Product does not turn on what age the purchaser's child is. And, if it did, the claim would be "inherently transitory" such that the "relation back" doctrine should be invoked. *Cnty. of Riverside v. McLaughlin*, 500 U.S. 44 (1991). Plaintiffs' proposed Rule 23(b)(2) class should have also been certified.

## II. STATEMENT OF JURISDICTION

Plaintiffs Tracy Howard and Adina Ringler, on behalf of themselves and a putative class of purchasers, filed their complaint against Hain on January 26, 2022. In an amended complaint filed November 2, 2022, Trecee Artis joined as a named plaintiff. The district court had jurisdiction under 28 U.S.C. §§ 1332, 1441, 1446, and 1453.

On February 22, 2024, the district court denied Plaintiffs' motion for class certification. 1-ER-13. On February 5, 2025, the district court granted summary judgment for Hain. 1-ER-3. On February 21, 2025, the district court entered judgment. 1-ER-2. Plaintiffs timely filed their notice of appeal on March 21, 2025. Because the district court's order finally disposed of the case, this Court has jurisdiction under 28 U.S.C. § 1291.

## III. ISSUES PRESENTED

1. Did the district court err by granting Hain's Motion for Summary Judgment when it failed to analyze the plain meaning of the regulation and instead adopted dicta from the Federal Register?
2. Did the district court err in concluding that no genuine issues of material fact existed as to whether Hain's Products are intended specifically for children under two when it weighed and interpreted evidence in favor of Defendant, i.e., the moving party?

3. Did the district court err by denying Plaintiffs' motion for class certification when it applied an incorrect standard of deception to Plaintiffs' UCL unlawfulness claim?
4. Did the district court err by finding the proposed class was overbroad because of its conclusion that there must be an inference of reliance for unnamed class members under the unlawful prong of the UCL?
5. Did the district court err by concluding that Plaintiffs did not have standing to seek injunctive relief for their unlawfulness UCL claim when it concluded that there was no risk of future deception?

## IV. STATEMENT OF THE CASE

This appeal arises out of a series of orders by the district court regarding Plaintiffs' individual and representative claims against baby food manufacturer Hain. These orders include the district court's (1) order denying Plaintiffs' motion for class certification based on a lack of reliance for unnamed class members and lack of standing to seek injunctive relief, (2) denial of Plaintiffs' motion for reconsideration of the order denying class certification, and (3) order granting summary judgment to Hain on Plaintiffs' individual claims.

Hain packages and sells retail food products specifically intended for infants and children under two years of age. While Hain sometimes includes an age indicator of the front label of its products, the Products at issue here do not include

a front label age indicator. As explained further below, the form and marketing of the Products to parents of children under two is central to this appeal.

Plaintiffs are California parents who purchased Hain Products for their children while their children were under two. Plaintiff Howard purchased the Fruit Yogurt & Smoothie Peach & Banana and Fruit Yogurt & Smoothie Apple Blueberry pouch products, Plaintiff Artis purchased the Chicken Casserole pouch and Beef Medley pouch, and Plaintiff Ringler purchased Apple Blueberry pouches. At the time Plaintiff Howard filed the original complaint, her child was under the age of two. 2-ER-65.

Plaintiffs testified regarding their decision to purchase the Hain Products. Each relied on the label claims including the quantitative protein claims and "excellent source" claims, and believed the products were healthy as a result. 2-ER-46-47 ; 2-ER-59-60 ; 2-ER-71-72.

### A. The Regulatory Framework

In implementing the Nutrition Labeling and Education Act (NLEA), the FDA promulgated regulations governing nutrient content claims, i.e., advertising claims that describe or characterize the level of nutrients in the product. 21 C.F.R. §§ 101.13(b) & (c). In the proposed rule for the regulations on nutrient content claims, including the regulation at issue in this case, the FDA described the purpose of these regulations as "promoting sound nutrition for the nation's consumers." 56

Fed. Reg. 60421. The FDA relied on the USDA's development of Dietary Guidelines as the basis for encouraging and discouraging the "selection of foods containing low or high levels of certain nutrients as part of an overall diet." *Id.*

One of these regulations states explicitly that: "no nutrient content claims may be made on food intended specifically for use by infants and children less than 2 years of age." 21 C.F.R. § 101.13(b)(3). California has, through § 110100 of the Sherman Law, adopted this prohibition as a parallel state-law duty.

The FDA prohibited nutrient content claims for children under two because there was "insufficient evidence" of the benefits of any increased intake of nutrients for that age group. There were Recommended Daily Intakes ("RDI") and Daily Recommended Values ("DRV") for most nutrients for children under two. *See* 58 Fed. Reg. 2302, 2305 (stating there are RDI's for children under two); 58 Fed. Reg. 2206, 2211 (providing the RDI's). Nevertheless, the FDA concluded nutrient content claims on labels for this group were inappropriate because "relatively little attention has been given" to the dietary patterns of children under two. 56 Fed. Reg. 60421.

Thus, the default is not to include nutrient content claims on product labels. *Reid v. Johnson & Johnson*, 780 F.3d 952, 959 (9th Cir. 2015) ("[T]he general rule is that 'nutrient content claims' are ***not permitted on food labels.***") (emphasis added).

### B. The Products Are Labeled with Nutrient Content Claims.

Hain's at-issue Products are labeled with nutrient content claims. Broadly, they fall into two categories: 1) Quantitative nutrient content claims such as "3g Plant Protein," and "4G PROTEIN per serving;" and 2) "Excellent source" claims such as "Excellent source of Calcium, Vitamins C & D" and "Excellent source of Iron, Zinc, & six B vitamins." 4-ER-625-727. *See* 21 C.F.R. §§ 101.13(c), 101.54(b).

### C. The Products Are Intended Specifically for Children Under Two.

The Products at issue include pouch products that are filled with pureed foods typically fed to babies as they are first introduced to solids around the age of 4-6 months.[3] The Products are packaged in pouches ranging in size from 4 to 4.5 oz. 4-ER-625-680; 4-ER-697-727. The pouches have spouts to feed babies that mimic a baby bottle. *Id.* The at-issue pouches are formatted in the same manner with the same spout as all of Hain's other products that include front label age indicators for children as young as 6+ months. 4-ER-729-733. All of the Products appear in the "Baby Food" aisle of grocery stores and are placed among other baby food and puree products. *See*, *e.g.*, 4-ER-1002 (featuring Products with headline "attract shoppers

[3] The Products at issue in the class certification motion included Products that are "substantially similar" to the Products Plaintiffs purchased. At summary judgment, only the pouch Products that Plaintiffs purchased were at issue. Thus, Appellant only addresses the pouch Products herein as relevant for review of the summary judgment order.

into the baby aisle with Sesame Street characters). All make nutrient content claims. ER-625-727

Hain's portfolio of pouch products includes products with a front label age indicator and those without a front label indicator. However, beyond the labeling difference, the Products are nearly identical. The Products are similar in format (pouches filled with pureed foods), ingredients (featuring two to four different fruits and vegetables), size (4-4.5 oz), and in how they are marketed in store (sold in the baby food aisle).

Hain's internal documents confirm that the Products are specifically for use by children under two. Its retailer presentations list the smoothie Products as being intended for children under two. 2-ER-20-24 (Reynolds Declaration describing Exs. 11-45); 12-ER-2569 - 16-ER-3622 (Exs. 11-45) (over 30 presentations showing the smoothie and meat based pouches as being for children 9+ months). The smoothie Products are marketed using Sesame Street characters, which Hain emphasized as being among the top characters for children 0-2 years old. In developing the protein line, Hain marketed to [redacted] 11-ER-2083 (emphasis added). And Hain's description of the foods as "toddler" foods confirms the foods are intended specifically for children under two. "Toddler" is defined by both Hain and the CDC as a child as young as one year old. *See* 14-ER-3022 [redacted]

[redacted] 4-ER-589-590 (CDC defining toddler as 1-2 years of age).

**D. Plaintiffs' Claims**

Because the Products are intended specifically for children under two, they are prohibited from including nutrient content claims on the front label. Despite the prohibition, Hain labels its Products with nutrient content claims such as "3g of Plant Protein, 4g PROTEIN per serving, and "Excellent source of Calcium, Vitamins C & D." 4-ER-625-727. These claims violate parallel state and federal laws that prohibit nutrient content claims on products intended specifically for children under two. Cal. Health & Safety Code § 110100; 21 C.F.R. § 101.13(b)(3). Plaintiffs purchased the Products in reliance on the nutrient content claims and paid more money for them as a result. 2-ER-46-47 ; 2-ER-59-60 ; 2-ER-71-72. Thus, Plaintiffs brought a claim under the unlawfulness prong of the UCL.

**E. The District Court's Decisions**

**1. Decisions on Class Certification**

On February 22, 2024, the district court denied Plaintiffs' Motion for Class Certification in a four-page order, finding that the class was overbroad because the proposed class "comprised all people who purchased the products, not just people who purchased the product for children under two." 1-ER-14. Regarding the unlawfulness UCL claim, the court imported the standard for fraud claims.

According to the court, "the whole point of a misbranding law is to prevent people from being misled, and the FDA regulations simply prohibit specific kinds of potentially misleading statements." *Id*. The court then reasoned that this required not only the named plaintiffs to have relied on the statements, but also "they must also show that it would at least be fair to infer that the rest of the class similarly relied on the alleged misrepresentation." *Id*. The court concluded that people who purchased for children over two "could not have been misled" and therefore "the proposed class simply does not fit the plaintiffs' theory of liability." *Id*.

Plaintiffs' damages model presented a model to compute the damages for the proposed class, i.e., all purchasers. Because Plaintiffs did not present a model that apportioned damages among purchasers for children over two versus under two, the district court concluded that "Narrowing the class definition to cover only purchases made for children under two would not fix things." *Id*.

Next, the court denied Plaintiffs' motion to certify a Rule 23(b)(2) class for injunctive relief because "plaintiffs do not have standing to seek injunctive relief." 1-ER-15. The court reasoned that the back-label disclaimer meant that plaintiffs would not be misled again. The court also concluded that because "plaintiffs have not shown or even alleged that they still have children under two or that they plan to have more children," it was unlikely that "they will want to repurchase the

products for children under two, or be misled about the products' suitability for their children." *Id*.

Despite identifying the supposed problem with Plaintiffs' motion, i.e., that the damages model needed revisions for a revised class definition that the district court adopted, the court denied the motion "without leave to file a renewed class certification motion." 1-ER-16.

Following the court's order on class certification, Plaintiffs moved for leave to file a motion for reconsideration of several issues. The court denied the motion, and offered further analysis of its order denying class certification. The court relied on *Shaeffer v. Califia Farms*, 44 Cal. App. 5th 1125 (2020), as "an example of how reliance is separate from misleadingness, and of how plaintiffs bringing unlawful-prong claims must still show reliance—not just on the label as a whole, but on the aspects of the label that make it unlawful." 1-ER-8. The court then extended the reasoning of a named plaintiff's reliance requirement to absent class members, concluding that "[t]his reliance requirement for UCL unlawful-prong claims also applies to class actions." 1-ER-9. The court pontificated on what a California appellate court would have required, suggesting that "[h]ad class certification been sought in a case involving the facts of *Califia Farms*, certification on the unlawful-prong claim would therefore have required an inference that absent class members relied on the label's failure to state that the juice was not low or reduced calorie."

*Id.* Based on this "principle," the court concluded "the failure to show that it would be reasonable to infer class-wide reliance rendered the proposed class overbroad." 1-ER-10.

The court then offered a novel distinction of *In re Steroid Hormone Product Cases*, 181 Cal. App. 4th 145 (2010), finding it inapplicable because "it involved a product 'that was illegal because of what it was,' not 'how it was labeled.'" 1-ER-10-11. While the court offered lengthy analysis of *Steroid Hormone*, it did not address *Stearns v. Ticketmaster*, despite concluding that "[n]one of the cases cited by the plaintiffs change this analysis." 1-ER-10.

### 2. Decision on Summary Judgment

On February 5, 2025, the district court granted summary judgment finding that "summary judgment must be granted for Hain because no reasonable jury could conclude that the products at issue are intended primarily for children under two." 1-ER-4. The court explained that "[w]hether this claim can proceed to a jury turns on the interpretation of the phrase 'intended specifically for use by infants and children less than 2 years of age' in 21 C.F.R. § 101.13(b)(3)." 1-ER-3. The court further explained that "[t]he FDA hasn't defined the term, and its meaning is unclear. But the best interpretation is that it means something like 'intended primarily.'" *Id.* In the very next sentence, the court admits "this is somewhat odd, because 'specifically' does not mean 'primarily.'" *Id.* But the court relied on FDA

commentary found in the Federal Register that explained "foods that are promoted for infants and children under the age of 2 but that are intended primarily for adults and older children" could have nutrient content claims. The district court explained again that its conclusion was "somewhat odd—it creates a fuzzy standard that seems like it allows companies to effectively circumvent the regulation and advertise products as being for children under two, despite the FDA saying that it doesn't want nutrient content claims on products directed to those children." 1-ER-4. Nonetheless, the district court concluded that the language in the final rule gave "support to the defendants' interpretation of the phrase 'intended specifically for.'" *Id*. The court acknowledged the absurdity: "Even though 'intended primarily for' is far from the most obvious reading of 'intended specifically for,' it's the most plausible interpretation given the available evidence.'" *Id*. And again, the court took pains to point out that "[i]t may be a weird meaning, and it may not make a lot of sense from a policy standpoint (because it might make more sense to simply say that if you market the product at all to parents with children under two, you can't have nutrient content claims on it), but this is the Court's best understanding of how the agency has defined the phrase." *Id*., n.1.

Despite its clear discomfort with the unreasonable interpretation lifted from the Federal Register, the court persisted. But before concluding that "Hain presents evidence indicating that the products are not intended primarily for children under

two," the court first noted that "plaintiffs put forward strong evidence—in particular, Hain's internal presentations—showing that Hain intends the products to be consumed by children under two." 1-ER-4. The court explained that "if 'intended specifically for' meant 'intended for' or 'actively promoted to,' the plaintiffs would get to go to trial (or would maybe even win on summary judgment)." *Id*. Despite this conclusion, the court found that "the plaintiffs' evidence does not show that the products are intended *primarily* for use by children under two." *Id*. Thus, the court granted summary judgment.

## V. SUMMARY OF ARGUMENT

Plaintiffs presented sufficient evidence to survive summary judgment on the fact question of whether Defendant's Products are intended specifically for use by children under two. Among other things: (1) dozens of Defendant's presentations to retailers consistently included the Products among those intended for children 9+ months; (2) Defendant's use of Sesame Street characters was intended to appeal to children under two; (3) Defendant's own expert confirmed that children as young as one year old eat snacks such as Defendant's Products; (4) Plaintiffs' survey evidence showed that consumers actually do purchase the Products for children under two; and (5) Defendant's Products are formatted as pureed fruits and vegetables fed through a spout that mimics a bottle, such that they can be eaten by children under two who are just beginning solids.

Because a reasonable jury could find that the Products are intended specifically for use by children under two, Plaintiffs are entitled to an opportunity to present their case at trial. In holding otherwise, the district court improperly interpreted the at-issue regulation and failed to credit Plaintiffs' evidence and controlling law. The following errors warrant reversal:

- In interpreting the at-issue regulation, the court did not exhaust or even employ the necessary "legal toolkit" to first determine whether the regulation is ambiguous. *Kisor*, 588 U.S. at 575. When considering the plain meaning and context of the regulation, it is clear that "intended specifically for use by . . . children less than 2 years of age" means only that there must be clear, precise, and definite indications that the Products are for use by children under two, i.e., that usage by this group is not merely incidental or by accident.
- The court improperly deferred to the Federal Register and replaced the word "specifically" in the regulation with the word "primarily" from the register, changing the meaning of the regulation. In doing so, the court adopted a definition that was outside "the bounds of reasonable interpretation." *Kisor*, 588 U.S. at 576.
- In holding that "no reasonable jury could conclude that the products at issue are intended primarily for children under two," the district court

improperly weighed the evidence and drew inferences in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The district court identified a single piece of evidence: the back label disclaimer as outweighing Plaintiffs' voluminous evidence, including the product design, placement in the baby food aisle, and dozens of retailer presentations in which Defendant represented the Products as being for children 9+ months.

Regarding the district court's denial of class certification, the Court made at least two fatal legal errors. First, Plaintiffs are not required to show deception for their UCL unlawfulness claim because, as this Court has held in an unpublished case regarding the exact same regulation: deception is not a requirement to prove a violation of the predicate regulation, i.e., 21 C.F.R. § 101.13(b)(3). Second. this Court and the California Supreme Court have explicitly held that for UCL claims, unnamed class members are not required to demonstrate reliance. *Stearns*, 655 F.3d at 1020 (citing *In re Tobacco II*, 46 Cal. 4th at 320). It is true that under Prop. 64, the *named plaintiff* must have "actually relied" on Defendant's conduct to have standing. However, these requirements do not extend to absent class members for either the fraud or unlawful prongs. *Id*. Thus, the district court erred when it denied certification based on its conclusion that plaintiffs "must also show that it would at least be fair to infer that *the rest of the class* similarly *relied* on the alleged

misrepresentation." *Id.* (citing employment cases, emphasis added); *see also* 1-ER-9. In short, neither reliance nor an inference of reliance is a requirement for absent class members for any prong of the UCL.

Further, the district court erred when it concluded that Plaintiffs could not pursue their proposed Rule 23(b)(2) class because they did not have standing to seek injunctive relief. The court decided this, *sua sponte*, without briefing on the matter. Plaintiffs are not required to show that they would have been misled again, only that if they purchased the Products again, they would have would have been harmed, i.e., paid a price premium, due to the unlawful labeling. Even if it were necessary to have purchased the Product for a child under two to have standing, Plaintiff Howard here does have standing because of the "inherently transitory" nature of the claims given the natural march of time that allows a child to grow faster than a case progresses. Had the district court considered case law, it is clear that Plaintiff Howard, whose child was under two at the time she filed her complaint had standing to seek injunctive relief under the relation back doctrine.

## VI. STANDARD OF REVIEW

The district court's grant of summary judgment is reviewed de novo. *Interstellar Starship Servs. v. Epix, Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whe[n]

he is ruling on a motion for summary judgment. . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. This Court "must reverse summary judgment if genuine issues of material fact remain such that [Hain] is not entitled to judgment as a matter of law." *Interstellar Starship Servs*., 184 F.3d at 1109.

The district court's denial of class certification is reviewed for abuse of discretion. *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1171 (9th Cir. 2010). The same is true for "any particular underlying Rule 23 determination involving a discretionary determination." *Yokoyama v. Midland Nat'l Life Ins*. Co., 594 F.3d 1087, 1091 (9th Cir. 2010). In so doing, the Court considers: "whether the district court correctly selected and applied Rule 23 criteria. An abuse of discretion occurs when the district court, in making a discretionary ruling, relies upon an improper factor, omits consideration of a factor entitled to substantial weight, or mulls the correct mix of factors but makes a clear error of judgment in assaying them." *Wolin*, 617 F.3d at 1171 (internal citations omitted).

While the review of discretionary class certification decisions is deferential, it is also true that decisions of district courts are not afforded deference when reviewing their determinations of questions of law. Further, an error of law is an abuse of discretion. *Yokoyama*, 594 F.3d at 1091.

The district court's determination that Plaintiffs lacked standing to seek injunctive relief is reviewed de novo. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 963 (9th Cir. 2018).

## VII. ARGUMENT

### A. Plaintiffs Presented Issues of Material Fact that Preclude Summary Judgment.

The UCL unlawful prong claim has two elements: (1) whether the defendant engaged in an unlawful labeling practice (i.e., unlawfulness); and (2) the amount of money the defendant "may have acquired by means of" its unlawful labeling practice (i.e., restitution.). *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th at 155. As relevant here, Plaintiffs allege that Hain's Products violate 21 C.F.R. § 101.13(b)(3) because they are labeled with nutrient content claims despite being "intended specifically for use by . . . children less than 2 years of age." To determine whether the Products violate the regulation, it is necessary to determine what qualifies as a product that is "intended specifically for use by" children under two. That requires resort to the standard tool kit of legal interpretation. *Kisor*, 588 U.S. at 575.

"Regulations are interpreted according to the same rules as statutes, applying traditional rules of construction." *Minnick v. Comm'r*, 796 F.3d 1156, 1159 (9th Cir. 2015). "Unless a statute provides an explicit definition, we generally give words 'their ordinary, contemporary, common meaning.'" *Pakootas v. Teck*

*Cominco Metals, Ltd*., 830 F.3d 975, 980 (9th Cir. 2016) (citation omitted). If the meaning of the text is unambiguous, the regulation must be enforced according to its terms. *See King v. Burwell*, 576 U.S. 473, 486 (2015). But when confronted with an ambiguous regulation, courts must use the "legal toolkit" and "'carefully consider[]' the text, structure, history, and purpose" of the regulation to derive its meaning. *Kisor*, 588 U.S. at 575 (citing *Pauley v. BethEnergy Mines, Inc*., 501 U.S. 680, 696 (1991) and then quoting *id*. at 707 (Scalia, J., dissenting)); *accord Goffney v. Becerra*, 995 F.3d 737, 742 (9th Cir. 2021). By relying on these classic tools of statutory interpretation, courts "resolve many seeming ambiguities out of the box" and avoid most complicated questions of policy or deference. *Kisor*, 588 U.S. at 575.

The first step in the analysis is to examine the "plain language" of the regulation. In relevant part, § 101.13(b)(3) requires:

> (b) A claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling under § 101.9 or under § 101.36 (that is, a nutrient content claim) may not be made on the label or in labeling of foods unless the claim is made in accordance with this regulation and with the applicable regulations in subpart D of this part or in part 105 or part 107 of this chapter.
>
> (3) Except for claims regarding vitamins and minerals described in paragraph (q)(3) of this section, no nutrient content claims may be made on food intended specifically for use by infants and children less than 2 years of age unless the claim is specifically provided for in parts 101, 105, or 107 of this chapter.

The regulation does not define what "intended specifically for use by" children under two means. Absent a regulatory definition, this Court must consider the ordinary meaning by "in part, dusting off our dictionaries." *United States v. Korotkiy*, 118 F.4th 1202, 1210 (9th Cir. 2024). According to multiple dictionaries, "specifically" means "in a definite or precise manner," or "with an exact use or purpose in mind." *See Specifically*, Dictionary.com, https://www.dictionary.com/browse/specifically; *see also Specifically*, Merriam-Webster Dictionary ("1 . . . in a definite and exact way: with precision . . . 2 used to indicate the exact identity, purpose, or use of something"). Notably, "specifically" does not mean primarily or exclusively in any dictionary. In this regulation, "specifically" requires only that there are definite, precise, or exact indications that the Products are for use by children under two. It does not mean, as the district court erroneously concluded, that the Product must be intended *primarily* for that age group. 1-ER-4.

Given that the legal toolkit provides a clear interpretation of the regulation, the regulation on which Plaintiffs' claims are based—§ 101.13(b)(3)—is not "genuinely ambiguous." If a product is intended specifically, i.e., definitely, precisely, or particularly, for use by children who are under two, the product cannot make a nutrient content claim.

The district court erred when it replaced the word "specifically" with "primarily." The district court improperly replaced a word in the regulation with a word from the Federal Register without first concluding that the regulation was ambiguous. The district court concluded that "intended specifically" means "foods primarily intended for children less than two years of age." 1-ER-4. It did so based on a portion of the Federal Register in which the FDA responded to a comment that objected to the prohibition of nutrient content claims "on foods primarily intended for infants and children less than two years of age while allowing such claims on products that, though aimed primarily at adults and older children, are actively promoted either on the label or in the advertising as being for use by infants or children less than 2 years of age." 58 Fed. Reg. 2302, 2304. In responding to the comment, the FDA explained:

> The agency has not prohibited claims on foods that are promoted for infants and children under the age of 2 but that are intended primarily for adults and older children. However, the agency cautions that any nutrient content claims made on such products in association with a statement about use of the food for infants and children under the age of 2 would be misleading under section 403(r) of the act unless such claim has specifically been permitted for such a population by regulation.

In conclusory fashion, the district court stated that "the FDA hasn't defined the term, and its meaning is unclear. But the best interpretation is that it means something like 'intended primarily.' This is somewhat odd, because 'specifically' does not mean 'primarily.'" 1-ER-3. The district court seemed perplexed by its

own conclusion, describing it this way: "It may be a weird meaning, and it may not make a lot of sense from a policy standpoint (because it might make more sense to simply say that if you market the product at all to parents with children under two, you can't have nutrient content claims on it), but this is the Court's best understanding of how the agency has defined the phrase." 1-ER-4, n.1. Indeed, the district court even went out of its way to point out that if it did not adopt the "intended primarily" meaning, "the plaintiffs would get to go to trial (or would maybe even win on summary judgment)." 1-ER-4.

In essence, the district court used the Federal Register to create ambiguity where none otherwise existed. It wrongfully adopted language from the Federal Register that merely parroted a public comment. In doing so, the district court erred when it failed to first consider the plain meaning of the regulation or employ any other tools from the "legal toolkit."

#### *a. The Federal Register Is Not Due Deference Because the Agency's Position Is Unreasonable*

Courts owe no deference to an agency's interpretation of a regulation when that interpretation contradicts the regulation's plain text. *See Kisor*, 588 U.S. at 574 ("A court should not afford *Auer* deference unless the regulation is genuinely ambiguous."). Deference is warranted only when a regulation is ambiguous (here, it is not) and the agency's interpretation is reasonable and reflects its authoritative, considered judgment—not when the agency's position, expressed as commentary

or explanatory text in the Federal Register, is inconsistent with the regulation itself, and "odd," "weird," "fuzzy," and "may not make a lot of sense" even by the Judge's own reckoning. 1-ER-4. In such circumstances, the plain language of the regulation controls. *See Gonzales v. Oregon*, 546 U.S. 243, 257 (2006) ("The existence of a body of interpretive commentary ... does not mean that courts must defer to it when it is inconsistent with the regulation's plain terms."); *see also Kisor*, 588 U.S. at 576 ("the agency's reading must fall 'within the bounds of reasonable interpretation.'") (citation omitted).

Here, the Federal Register commentary upon which the district court relied cannot be given deference because it directly conflicts with the unambiguous language of the regulation. *Kisor* explained that ambiguity is found where there is a "choice between (or among) more than one *reasonable* meaning." *Id.* at 568 (emphasis added). Under *Kisor*, the district court was required to employ the statutory toolkit not only to determine whether the regulation is ambiguous, but if it is, then to determine "the zone of ambiguity" to "establish the outer bounds of permissible interpretation." *Kisor*, 588 U.S. at 575-76.

The district court did not first establish the competing reasonable meanings, and instead itself acknowledged that deferring to the "intended primarily" language from the agency was "somewhat odd—it creates a fuzzy standard that seems like it allows companies to effectively circumvent the regulation and advertise products

as being for children under two, despite the FDA saying that it doesn't want nutrient content claims on products directed to those children." 1-ER-4. Thus, the district court concluded that "[e]ven though 'intended primarily for' is far from the most obvious reading of 'intended specifically for,' it's the most plausible interpretation given the available evidence." *Id*. The district court's analysis of its interpretation should have led to the conclusion that deferring to the agency definition was not reasonable.

Emphasizing the absurdity of the result, the district court concluded that if it did not adopt the "intended primarily" interpretation of the regulation, "plaintiffs would get to go to trial (or would maybe even win on summary judgment)." 1-ER-4. Thus, it is clear that the district court's error in interpreting the regulation entitles Plaintiffs to reversal in and of itself. This Court should give effect to the regulation as written, not to an agency's later commentary that effectively alters or expands its meaning. Accordingly, the Court should decline to defer to the Federal Register statements and interpret the regulation in accordance with its plain text as described above. However, even if the Court agrees that "specifically" somehow means "primarily," Plaintiffs' evidence still created a disputed issue of fact that should have gone to a jury.

### 2. Plaintiffs' Evidence Established a Triable Issue of Fact

With this backdrop, it is clear that summary judgment was not appropriate on Plaintiffs' UCL claim. Hain did not dispute that the Products contain nutrient content claims. Thus, the only question is whether Plaintiffs' evidence created a triable issue of fact regarding whether the Products were intended specifically for use by children under two. It did.

The district court agreed that "plaintiffs put forward strong evidence—in particular, Hain's internal presentations—showing that Hain intends the products to be consumed by children under two. If 'intended specifically for' meant 'intended for' or 'actively promoted to,' the plaintiffs would get to go to trial (or would maybe even win on summary judgment)." 1-ER-4. Rather than rule on this conclusion, the district court improperly weighed evidence in favor of Hain to conclude that its back label disclaimer outweighed the evidence from Plaintiffs. But this was in error. Indeed, the evidence in Plaintiffs' favor was voluminous.

Hain consistently marketed the Products for children under two, demonstrating that regardless of the fine print on the back label, it still intends the Products be consumed by children under two. Hain stated that its "target" consumer is [redacted] 12-ER-2594. Hain admitted the Products are for toddlers, which is defined as children as young as 1 year old. *See*, *e.g.*, 5-ER-786:3-5; 4-ER-589-590; 4-ER-592-600. Hain's presentations to retailers

consistently represented the Products as being for children under two. Indeed, Plaintiffs submitted over thirty presentations to approximately 25 retailers from Nov. 2018-Feb. 2022 that presented a "birth to backpack" timeline similar to the presentation shown below that placed the Sesame Street pouches alongside a meat-based pouch in a category for children "9+ months:"

2-ER-20-24 (Reynolds Declaration describing Exs. 11-45); 12-ER-2569 - 16-ER-3622 (Exs. 11-45) (over 30 presentations showing the smoothie and protein products intended for children under two in "birth to backpack" timeline).




When asked why Hain's labels include the "For Ages 2+" disclaimer, Hain's 30(b)(6) witness testified that it was because of [redacted]

4 [redacted]

[redacted] When asked why the Products are not specifically for children two years old, Hain's 30(b)(6) witness testified that it was because: (1) The pouches are snack products and "snacks are a behavior that typically starts in preschool" (2-ER-24:13-25); (2) The size of the pouch is larger for larger kids and for toddlers (2-ER-35:3-5); (3) the use of Sesame Street branding (2-ER-35:12-17); and (4) The "complexity" of ingredients like fruit, vegetables, and yogurt (2-ER-35:12-16).

Hain's own evidence debunks these ad hoc explanations as to why the Products are supposedly not intended for children under two. Hain's expert Dr. Clemens' report describes the Products as snack products for "young children" which he confirmed meant children under two. 9-ER-1790 (Clemens Report) at ¶ 19. He cites to a report that states children should begin a "regular meal pattern of three small meals and two to three planned between-meal snacks" beginning at age one. *See*, 9-ER-1791, n. 3; 4-ER-607-610. Thus, contrary to Hain's testimony, snacking is not a behavior that starts in preschool. The size of the pouch also

---

[redacted]

confirms the Products are intended specifically for children under two. The smoothie pouches are 4.2 oz and the protein pouches are 4.5 oz. Hain's other pouches that are labeled as being for children 6+ months and 9+ months are the same size. For example, the Pumpkin Cranberry Apple pouch is labeled as being for Stage 3, 9+ months and is 4.2 oz. *See* 4-ER-731.

The use of Sesame Street branding is also not dispositive of the Products being intended for children over two, as evidenced by Hain's own documents. The smoothie products are marketed using Sesame Street characters, which Hain emphasized as being among the top characters for children 0-2 years old and would "attract shoppers into the baby aisle." *See* 5-ER-999; 5-ER-1002.

Hain's claim that the "complexity" of the ingredients is an indication that the Products are intended for children two and older is also contradicted by its own evidence. The smoothie pouches have two fruit purees or puree concentrates and yogurt, along with water, and are fortified in order to make nutrient content claims. *See*, *e.g.*, 4-ER-625-680. All of Hain's Earth's Best products that are labeled as "Stage 2, 6+ Months" contain at least two different fruits or vegetables. *See*, *e.g.*, 4-ER-729, 732, 733. One of the pouches for a 6+ month old includes a combination of four fruits and vegetables: apple, sweet potato, pumpkin, and blueberry. 4-ER-733. Thus, the purported "complexity" of the pouches does not entitle Hain to summary judgment.

Hain's own evidence also demonstrated that the Protein pouches are intended for Stage 3, i.e., for children 9+ months. *See* 5-ER-1051 (photos of protein pouches, describing them as "baby/toddler foods" and indicating they are "Stage 3."); 12-ER-2389 (showing protein pouches as being for "9+ months").

Hain argued, and the district court agreed, that the fact that its other baby food products are labeled differently by including age disclaimers on the front label demonstrates that these Products are intended for children over two. *See* 1-ER-4-5. However, that interpretation improperly weighed evidence in favor of Hain as the moving party. A more plausible interpretation (and one the court was obligated to draw in favor of Plaintiffs as the non-movants) is that these labels show that Hain knows how to communicate the age for which the products are intended: on the front label. *See* 4-ER-729-737 (showing intended ages on the front label, in different color font and with banners to highlight the ages). The Products at issue here bury the age disclaimer in small font hidden on the back label. The reason why is obvious: Hain intends to sell the Products for use by children under two and yet wants to gain a marketing advantage by including nutrient content claims. *See* 11-ER-2371 (Hain's 2018 presentation to Sesame Street states that [redacted]"). Thus, in a failed attempt to avoid liability, it buried an age disclaimer on the back label to maintain the

auspice of innocence. The comparison of the two product lines demonstrates that Hain did not intend the products be purchased for children over two, and instead it only included the disclaimer in an attempt to sidestep the regulations and allow it to gain a competitive advantage.

Defendant did not rebut Plaintiffs' evidence that the Products being sold in the baby food aisle indicates that they are intended specifically for use by children under two. Hain's own documents confirm that [redacted] 11-ER-2133. According to the American Academy of Pediatrics, "the average age toilet training begins in the United States is between 2 and 3 years of age." 4-ER-602-04. Hain's documents also confirm that to [redacted] 11-ER-2133. Hain's presentations representing that the Products are intended for children under two were used in meetings with retailers, which informed the retailers' decisions to sell the products in the baby food aisle of stores. According to Hain, retailers sell the Products in the baby food aisle to "maximize" their sales. 2-ER-33:20-25.

In short, even if "intended specifically" did mean "intended primarily" for use by children under two, the district court's grant of summary judgment was still in error. One need look no further than the form of the Products to see that they are intended "primarily" for use by children under two. Another way to think about it

is this: why would a child older than two be eating pureed meat from a pouch with a bottle spout? They wouldn't. The Products are intended both specifically and primarily for children under two. At minimum, a "fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 255. Accordingly, the district court's order granting summary judgment in favor of Hain should be reversed.

### B. The District Court Erred in Denying Class Certification

In denying Plaintiffs' motion for class certification, the district court held that Plaintiffs failed to satisfy Rule 23(b)'s predominance requirement. It did so on two grounds, both of which were informed by fundamental errors of law: that consumer deception and class wide reliance were elements of Plaintiff's UCL *unlawful* prong claim. As a result of this legal error, the Court held that the class could not be certified because Plaintiff had (1) failed to establish an inference of reliance for unnamed class members, and (2) proposed an overbroad class because it included some consumers who could not have been deceived by the labeling. 1-ER-14. Both conclusions were wrong as a matter of law, and "'[w]hile [the] review of discretionary class certification decisions is deferential, it is also true that [the Ninth Circuit] accord[s] the decisions of district courts no deference when reviewing their determinations of questions of law. Further, this court has oft repeated that an error of law *is* an abuse of discretion.'" *Stearns*, 655 F.3d at 1018

(quoting *Yokoyama*, 594 F.3d at 1091). Before addressing the district court's errors, Plaintiffs first explains why the claim satisfies Rule 23(b).

### 1. Plaintiffs' UCL Unlawful Prong Claim Meets the Requirements for Class Certification.

The Rule 23(b)(3) predominance analysis, "begins, of course, with the elements of the underlying cause of action." *Stearns*, 655 F.3d at 1020 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 809 (2011)). The UCL establishes three varieties of unfair competition—acts or practices which are (1) unlawful, (2) unfair, or (3) fraudulent. *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999). Thus, "[e]ach of these adjectives captures a separate and distinct theory of liability." *Rubio v. Capital One Bank*, 613 F.3d 1195, 1203 (9th Cir. 2010) (quotation marks omitted).

The instant appeal concerns only the UCL's unlawful prong, which "borrows" predicate legal violations and makes them independently actionable. *Wang v. Massey Chevrolet*, 97 Cal.App. 4th 856, 871 (2002). "Virtually any law . . . can serve as a predicate for an action under the UCL." *Smith v. State Farm Mut. Auto. Ins. Co.*, 93 Cal. App.4th 700, 718 (2001). In determining what is required to make an "unlawful" prong claim, courts look at the predicate violation. *Klein v. Chevron U.S.A., Inc.*, 137 Cal. Rptr. 3d 293, 326–27 (Cal. Ct. App. 2012); *see also Friedman v. AARP, Inc.*, 855 F.3d 1047, 1052 (9th Cir. 2017) (same).

Here, Plaintiffs allege that Hain's Products including front label nutrient content claims are prohibited under 21 C.F.R. § 101.13(b)(3), as incorporated by California's Sherman Law. Plaintiffs' claims are actionable under the unlawful prong of the UCL on that basis alone. *See Farm Raised Salmon Cases*, 42 Cal. 4th 1077, 1091 n.13 (2008) ("There is no dispute that, under California law, private parties may assert UCL claims based on violations of the Sherman Law."). Deception of a reasonable consumer is not an element of section 101.13(b)(3), which states, *inter alia*, that "no nutrient content claims may be made on food intended specifically for use by infants and children less than 2 years of age." Unless reasonable consumer deception is an element of the predicate violation, it is not an element of a claim under the unlawful prong. *See, e.g., Bruton v. Gerber Prods. Co*., No. 15-15174, 2017 U.S. App. LEXIS 12833, at *6 (9th Cir. July 17, 2017) (the "best reading of California precedent is that the reasonable consumer test is a requirement under the UCL's unlawful prong only when it is an element of the predicate violation."). Sometimes food labeling regulations do prohibit conduct only if it is misleading, but this regulation notably does not. *Cf.* 21 C.F.R. § 101.13(i)(3) (labeling "may contain a statement about the amount or percentage of a nutrient if: . . .The statement does not in any way implicitly characterize the level of the nutrient in the food *and it is not false or misleading in any respect*")

(emphasis added). Accordingly, as explained more fully below, consumer deception was not a required element of Plaintiff's burden of proof.

Thus, beyond each Plaintiff's individual Prop. 64 standing, the elements of their UCL unlawfulness claim are to show that (i) Hain violated the predicate regulation and (ii) money or property "may have been acquired by means of" the unlawful conduct. Cal. Bus. & Prof. Code § 17203. Plaintiffs established that both of these elements are subject to common proof. Indeed, in *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 155 (2010), a seminal case on class certification under the UCL unlawful prong, the court held that an unlawful claim presented only two issues, "both of which are common to the class: (1) whether GNC's sale of androstenediol products was unlawful; and if so, (2) the amount of money GNC 'may have . . . acquired by means of' those sales that must be restored to the class." The same holds true here.

Whether Defendants' Products are intended for children under two is necessarily a common question subject to common proof. Resolution of the issue does not depend on issues specific to individual consumers. And, like any food labeling case, the best evidence is the Products themselves. But here, there is more.

There is no dispute that all of the labels include nutrient content claims. The Products all appear in the "birth to backpack" timeline in retailer presentations under "9+ months" and "12+ months." Further, within the Products, there are three

major groupings: the protein pouches; the Sesame Street pouch Products; and the snack Products. The protein pouches and Sesame Street pouches are both made of fruits, vegetables, and meat that are pureed to a consistency to feed to children being introduced to solids. 4-ER-625-680; 4-ER-697-727. They are similar sizes and have a spout that mimics a bottle. *Id*. Common evidence overarching these three Product groups all demonstrates that question of who the Products are intended for is subject to common evidence. *See*, *e.g.*, *id*. (Product labels showing format of Product); 4-ER-682-686, 693-695 (labels specifically instruct that the Products be fed to "toddlers" who can "chew solid foods"); 2-ER-20-24 (Reynolds Declaration describing Exs. 11-45); 12-ER-2569 - 16-ER-3622 (Exs. 11-45).

Regarding the amount of restitution, Plaintiffs submitted a damages model to show that everyone in the class paid a price premium for the Products as a result of the unlawful nutrient content claims. 3-ER-80 at ¶ 12; 6-ER-1163 at ¶¶ 11-12; *Noohi v. Johnson & Johnson Consumer Inc.*, 2025 U.S. App. LEXIS 18547, at *11-12 (9th Cir. 2025) (quoting *Lytle v. Nutramax Labs., Inc.*, 114 F.4th 1011, 1031 (9th Cir. 2024)). Plaintiffs' experts designed and executed a conjoint survey and analysis for the following Products: plant-based protein pouches, meat-based protein pouches, and Sesame Street smoothie pouches. The conjoint analysis shows that for California consumers, the "4g protein per serving" claim commanded a 22.7% price premium, the "3g plant protein" claim commanded a

12.6% price premium, and the "Excellent source of Calcium, Vitamins C & D" claim commanded a 24.4% price premium. Plaintiffs' experts applied those price premiums to the total sales to calculate the total damages for class members. 6-ER-1178. Although currently focused on one product category (i.e., pouches), the same survey design will be used to evaluate the price premium for all remaining Product categories. *See Noohi*, 2025 U.S. App. 24 LEXIS 18547, at *11-12.

Thus, the issues are subject to common proof and a UCL unlawfulness class should have been certified.

#### 2. The District Court Abused Its Discretion by Holding that Deception Was a Required Element of Proof.

Although the district court officially denied certification on two grounds, discussed more fully below, each of those grounds was predicated on a threshold error of law. Namely, that Plaintiffs' unlawful prong claim was "substantially similar to their fraud claims" because "the whole point of misbranding law is to prevent people from being misled, and the FDA regulations simply prohibit specific kinds of potentially misleading statements." 1-ER-14. As a result, the district court held that Plaintiffs were required to prove deception and that, since Plaintiffs had not (1) shown that absent class members relied on a misleading statement, and (2) had proposed a class of all purchasers, which included some people who could not have been deceived, it denied class certification. The district court's legal conclusion on this matter was an abuse of discretion.

Indeed, in *Bruton*, this Court reversed a district court's virtually identical reasoning on a virtually identical claim. *See Bruton v. Gerber Prods. Co.*, No. 15-15174, 2017 U.S. App. LEXIS 12833 (9th Cir. July 17, 2017). There, a plaintiff brought UCL unlawful and fraud prong claims alleging that Gerber sold baby food products with nutrient content claims (i.e., the exact claims Plaintiffs brought in this case). The district court granted summary judgment on the fraud-based claims, concluding that the plaintiff failed to present evidence that the nutrient content claims were likely to mislead reasonable consumers. *Bruton v. Gerber Prods. Co.*, No. 12-CV-02412-LHK, 2014 U.S. Dist. LEXIS 175601, at *22 (N.D. Cal. Dec. 18, 2014). The district court in *Bruton* then rejected plaintiff's "attempts to bifurcate her lawsuit" between her "misbranding" claims (UCL unlawfulness prong) and "deception" claims (UCL fraud prong). *Id.* According to the *Bruton* district court, the "'misbranding' claims do in fact sound in fraud" because the purpose behind the regulation was to prohibit nutrient content claims "precisely because nutritional claims on infant and toddler food can be highly misleading," which plaintiff herself had argued. *Id.* at *22–23.

This Court reversed, holding that the district court erred in granting summary judgment on Bruton's claims that the labels were unlawful under the UCL. Although its analysis was brief, this Court rejected both the district court's conclusion and its reasoning. It explained:

> The best reading of California precedent is that the reasonable consumer test is a requirement under the UCL's unlawful prong only when it is an element of the predicate violation. [Citations.] The predicate violation here is of California's Sherman Law, see Cal. Health & Safety Code §§ 110760, 110765, which itself incorporates standards set by FDA regulations, see id. §§ 110100, 110670. *These FDA regulations include no requirement that the public be likely to experience deception*. *See* 21 C.F.R. §§ 101.13(b)(3), 101.60(c)(2)(v).

*Bruton*, 2017 U.S. App. LEXIS 12833, at *6 (citations omitted, emphasis added). In other words, where, as here, proving a predicate violation requires no proof of consumer deception, neither does a corresponding UCL unlawful prong claim, even if the predicate regulation's purpose is to prevent such deception. All that matters is that the challenged representation was unlawful—i.e., should not have been there.

Although *Bruton* is unpublished, in reaching its conclusion that the reasonable consumer test is not an element of a UCL unlawfulness claim, this Court relied on published California state opinions where the analysis of the unlawfulness claim also did not require a showing of deception. *Id.* (citing *L.A. Mem'l Coliseum Com. v. Insomniac, Inc.*, 233 Cal. App. 4th 803, 836 (2015)). Indeed, this is a throughline of many California cases that further confirms that the reasonable consumer test is not an element of a UCL unlawfulness claim unless deception is an element of the predicate violation. *See, e.g., Shaeffer*, 44 Cal. App. 5th at 1135–36 (explaining elements of fraud prong as compared to unlawful prong); *Kitchen v. Blue Diamond Growers Imaged*, No. 37-2022-00043885-CU-

BT-CTL, 2023 Cal. Super. LEXIS 60110, at *4 (Sup. Ct. San Diego Aug. 11, 2023) (to state a UCL unlawfulness claim, plaintiff only needed to "make clear what law or public policy is alleged to have been violated," noting that the plaintiff did not bring claims under the fraud prong); *In re Steroid Hormone Cases*, 181 Cal. App. 4th at 155–59 (analyzing UCL unlawful prong claim differently from CLRA claim that arose from same conduct). And at least twelve separate district courts have followed *Bruton* to reject attempts to require proof of consumer deception in UCL unlawful prong cases where the predicate act does not so require.[5] Therefore, the district court's treatment of Plaintiffs' UCL unlawfulness

---

[5] Numerous district court have similarly concluded that UCL unlawful prong claims require no proof of deception unless the predicate violation so requires. *E.g.*, *Gitson v. Trader Joe's* Co., No. 13-cv-01333-WHO, 2013 U.S. Dist. LEXIS 144917, at *18 n.5 (N.D. Cal. Oct. 4, 2013) ("As noted below, the reasonable consumer test does not apply to the plaintiffs' claims under the unlawful prong of the UCL predicated on Sherman Law violations."); *De Keczer v. Tetley USA, Inc.*, No. 5:12-CV-02409-EJD, 2014 U.S. Dist. LEXIS 121465, at *7–8 (N.D. Cal. Aug. 28, 2014) (fraud prong requires reasonable consumer test; unlawful prong does not); *Morgan v. Wallaby Yogurt Co.*, No. 13-cv-00296-WHO, 2013 U.S. Dist. LEXIS 144959, at *29 (N.D. Cal. Oct. 4, 2013) (violation of Sherman Law sufficient to state a claim under unlawful prong); *Ang v. Bimbo Bakeries USA, Inc.*, No. 13-cv-01196-WHO, 2014 U.S. Dist. LEXIS 34443, at *28–29 (N.D. Cal. Mar. 13, 2014) (contrasting UCL unlawful prong analysis where "[t]he label is either illegal or it is not" with context specific fraud analysis); *Swearingen v. Yucatan Foods, L.P.*, No. C 13-3544 RS, 2014 U.S. Dist. LEXIS 18094, at *23 (N.D. Cal. Feb. 7, 2014) (holding that a plaintiff asserting UCL unlawful claim predicated on a Sherman Law violation does not have to plead deception of the reasonable consumer); *Rahman v. Mott's LLP*, No. CV 13-3482 SI, 2014 U.S. Dist. LEXIS 11767, at *23 (N.D. Cal. Jan. 29, 2014) ("[T]he reasonable consumer test does not apply to claims brought under the unlawful prong of the UCL.").

claim as "substantively similar" to a fraud prong claim was a legal error that warrants reversal.

### 3. The District Court Abused Its Discretion by Requiring an Inference of Reliance on Behalf of Unnamed Class Members

Binding caselaw from this Court and the California Supreme Court establish that, regardless of whether a claim sounds in fraud, proof of class wide reliance is not required on a motion for class certification. In *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009), the California Supreme Court considered the issue of "who in a UCL class action must comply with Proposition 64's standing requirements, the class representatives or all unnamed class members, in order for the class action to proceed?" *Id*. at 306. Under Prop. 64, UCL claims may be brought only by a "person who has suffered injury in fact and has lost money or property as a result of [such] unfair competition." *Id*. The court's conclusion was explicit: "We conclude that standing requirements are applicable only to the class representatives, and not all absent class members." *Id.* The California Supreme Court's holding was based on its reasoning that Prop. 64 was meant to prevent uninjured private individuals from suing for restitution on behalf of others, but that "nothing in the text of Proposition 64, nor in the accompanying ballot materials, makes any reference to altering class action procedures to impose upon all absent class members the standing requirement imposed upon the class representative." *Id.* at 319.

The holding of *In re Tobacco II Cases* was echoed by this Court in *Stearns*. There, this Court reversed a district court's denial of class certification based on a determination "that individual issues predominated for purposes of the UCL claim because individualized proof of reliance and causation would be required." *Stearns*, 655 F.3d at 1020–21. This Court reasoned that

> [In *In re Tabacco II Cases*,] the California Supreme Court reviewed California UCL law and made it plain that: [T]o state a claim under either the UCL or the false advertising law, based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived. To achieve its goal of deterring unfair business practices in an expeditious manner, the Legislature limited the scope of the remedies available under the UCL. A UCL action is equitable in nature; damages cannot be recovered. . . . We have stated under the UCL, [p]revailing plaintiffs are generally limited to injunctive relief and restitution. The fraudulent business practice prong of the UCL has been understood to be distinct from common law fraud. A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages. None of these elements are required to state a claim for injunctive relief under the UCL. This distinction reflects the UCL's focus on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's larger purpose of protecting the general public against unscrupulous business practices.

*Id*. (citation omitted). This is because Prop. 64 "repaired the danger of frivolous strike suits, but it decidedly did not change the California rule 'that relief under the UCL is available without individualized proof of deception, reliance and injury.' *Id*. (citation omitted). Indeed, *Stearns* held that it was sufficient that "[e]ach alleged class member was relieved of money in the transactions. Moreover, it can

hardly be said that the loss is not fairly traceable to the action of the Appellees within the meaning of California substantive law." *Id*.

Here, the district court held that "[t]he whole point of a misbranding law is to prevent people from being mislead" and that, accordingly, "plaintiffs' unlawful-prong claim is thus substantially similar to their fraud claims," meaning that "they must also show that it would at least be fair to infer that the rest of the class similarly relied on the alleged misrepresentation." 1-ER-14. But where, as here, class "relief under the UCL is available without individualized proof of deception, *reliance* and injury," *Stearns*, 655 F.3d at 1020–21 (emphasis added), the district court's contrary holding was an abuse of discretion. This is especially true, where, like *Stearns*, Plaintiffs have proffered evidence that all class members paid a price premium as a result of Hain's unlawful label claim—meaning that "[e]ach alleged class member was relieved of money in the transactions." *Id*.

#### 4. The District Court Abused Its Discretion by Holding That Plaintiff's Class Was Over Broad

As emphasized in *Stearns*, "relief under the UCL is available without individualized proof of deception, reliance and injury." *Stearns*, 655 F.3d at 1020. The district court here held that Plaintiffs' unlawfulness claim could not be certified for a class of all purchasers because "those who bought the products for children two and up could not have been misled." 1-ER-14. As discussed above, deception is not an element of Plaintiffs' UCL unlawfulness claim and thus is not a

basis to exclude any class members. The district court erred in its conclusion that the proposed class was overbroad for at least three reasons: 1) as discussed above, neither reliance or deception is a basis to exclude class members; 2) even if it were, there was no evidence regarding the number of class members who purchase the Products for their child while the child was under two versus over two; and 3) even if there were such evidence, the presence of some uninjured class members does not automatically result in an overbroad class.[6]

### 5. The District Court Doubled Down on These Errors In Denying Plaintiff's Motion for Reconsideration

In concluding that Plaintiffs' proposed class was "overbroad" because it included some purchase who "could not have been *defrauded*."1-ER-14 (emphasis added). In doing so, the district court abused its discretion because it made a legal error when it applied Prop. 64's standing requirement to the class.

[6] "When individualized questions relate to the injury status of class members, Rule 23(b)(3) requires that the court determine whether individualized inquiries about such matters would predominate over common questions." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022). The district court did not attempt to discern the number of class members purchased the Products for children under two, and therefore did not make a determination about whether individualized inquiries predominate over common questions. Instead, it assumed such purchasers existed and that they "could not have been misled" such that "for the unlawful-prong claim, just as for the fraud claims, the proposed class simply does not fit the plaintiffs' theory of liability." 1-ER-14. Thus, the court did not engage in the "rigorous analysis" required by Rule 23, and by failing to do so it abused its discretion. *Olean*, 31 F.4th at 669.

Recognizing the legal error, Plaintiffs filed a motion for leave to file a motion for reconsideration. In the order denying leave to file the motion, the district court expanded on its reasoning for denial of class certification. The district court cited *Shaeffer v. Califa Farms, LLC*, 44 Cal. App.5th 1125 (2020) to conclude that, under Prop. 64, because a *named plaintiff* was required to show reliance on an allegedly mislabeled statement, that "plaintiffs must show that it's at least fair to infer that the rest of the class also relied on the alleged mislabeling." 1-ER-8-9. First, *Shaeffer* is a decision reviewing a motion to dismiss, not a motion for class certification. *See generally*, *Shaeffer,* 44 Cal. App.5th at 1132. Thus, nothing in *Shaeffer* is applicable to what is required of unnamed class members—much less that a plaintiff must establish a "fair" inference of reliance by unnamed class members. *Id*. There, instead, the plaintiff failed to establish her *own* reliance as required by Prop. 64. *Id*. at 1143. That is to say, the court below did not find that Plaintiffs had not established reliance as to *themselves* but rather that Plaintiffs had not established reliance as to the unnamed class members. Here, by contrast, "the order didn't hold that the *plaintiffs* failed to state an unlawful-prong claim because they didn't show that the labels were deceptive or misleading. Rather, the order noted that that label could not have been misleading as to people who bought the products for children aged two or older to explain that those purchases could not have *relied* on the allegedly unlawful aspects of the label." 1-ER-7 (first emphasis

added). *Shaeffer*, however, stands for no such proposition. And it does nothing to "change the California rule 'that relief under the UCL is available without individualized proof of deception, reliance and injury.'" *Sterns,* 655 F.3d at 1020–21 (citation omitted).

Moreover, with respect to the reliance required of a named plaintiff under Prop. 64, a plaintiff must show actual reliance when the underlying unlawfulness claim sounds in fraud, but that is notably different from a reasonable consumer standard. *See*, *e.g*., *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326, 120 Cal. Rptr. 3d 741, 754 (2011) (standing requires alleging "actual reliance" on a label statement for misrepresentation claim); *Hale v. Sharp Healthcare*, 183 Cal. App. 4th 1373, 1385 (2010) ("actual reliance" only required where UCL claim sounds in fraud). Ultimately, the court in *Sheaffer* held the plaintiffs failed to state an unlawfulness claim because they failed to establish the predicate violation of 21 C.F.R. §101.60(c)(2). *Shaeffer,* 44 Cal. App.5th. at 1140–43. The court then separately held plaintiffs failed to sufficiently plead deception and therefore dismissed the fraud claims. *Id*. at 1139. The *Shaeffer* court did not, however, apply the reasonable consumer test to the plaintiffs' unlawfulness claims, even though the predicate violation was an FDA regulation governing nutrient content claims. *See Shaeffer*, 44 Cal. App. 5th at 1144. The court reasoned: "plaintiff contends that she can show reliance upon a particular omission as long as it was "a substantial

factor … in influencing [her] decision" to buy a product, and that she need not show it was "the sole or even the decisive" reason for the purchase. *Tobacco II,* 46 Cal.4th at 326, 328. While we accept this statement of the law, we reject its relevance to this case because plaintiff has not alleged that low calorie content is one of many reasons for her purchase." *Id*. Thus, because plaintiff failed to allege that she relied on the alleged unlawful low calorie content statement, the court dismissed the claim, in part, for her failure to plead Prop. 64 standing. *Id.*

The district court here failed to acknowledge the distinction in *Schaeffer's* reasoning between the elements of the unlawful claim versus the requirements for Prop. 64 standing. The district court announced the "principle" from *Schaeffer* as being that "unlawful-prong claims require a showing of reliance on the aspects of a label that make it unlawful" and extended the "principle" to class members, concluding that "in a class action it must be fair to infer reliance on the part of absent class members." 1-ER-9. This legal error requires reversal.

**6. The District Court Abused Its Discretion by Refusing to Certify a Narrower Class.**

Even if the district court was correct in reasoning the that proposed class was overbroad for its inclusion of purchasers for children over the age of two, the correct course of action would have been to narrow the proposed class, rather than flatly deny certification with prejudice. The district court declined to narrow the class because it concluded that Plaintiffs' proposed damages model calculated

Defendant's "total liability for a given product by multiplying the alleged price premium by the total number of purchases made during the class period." 1-ER-15. Thus, the court concluded: "The model is unable to distinguish purchases that were made for children under two from purchases that were not. So the model cannot measure damages for a class encompassing only purchases made for children under two. [citations]. Narrowing the class definition would just trade one reason to deny class certification (an overbroad class) for another (an unsuitable damages model)." *Id*. The court reached this conclusion despite a lack of any evidence regarding how many class members purchased the Products for children over two, i.e., whether the number of supposedly uninjured class members was de minimis.

In *Olean*, an *en banc* panel of the Ninth Circuit stated that a district court "must consider whether the possible presence of uninjured class members means that the class definition is fatally overbroad." 31 F.4th 651, 669 n.14 (9th Cir. 2022). "Defining a class so as to avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of an art than a science." *Messner v. Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). Both, however, "can *and often should* be solved by refining the class definition rather than by flatly denying class certification on that basis." *Olean*, 31 F.4th at 669 n.14 (quoting *Messner*, 669 F.3d at 825) (emphasis added).

So too here. Under the district court's reasoning, the "proposed class is overbroad." 1-ER-14. If true—and especially, as here, where there is a clear age-based delineation at which to sever the class— under *Olean*, the court should have refined rather than flatly denying a class that includes some number of uninjured members. *See Olean*, 31 F.4th at 669 n.14.

### C. The District Court Erred by Finding that Plaintiffs Did Not Have Standing to Pursue Injunctive Relief.

Plaintiffs alleged and testified that they continue to desire to purchase Defendant's Products, would likely purchase the Products again if the products were appropriately labeled, that they regularly visit stores where Defendant's Products are sold and they "cannot rely on Defendant's labels" when shopping for these and other Products in the future. *See* ECF 58 at ¶¶ 137, 143, 146. These allegations are sufficient to confer standing to Plaintiffs, as confirmed by this Court in *Davidson*, 889 F.3d at 966–72 (plaintiff properly alleged a "threat of imminent or actual harm by not being able to rely on [the] labels in the future" that is "sufficient to confer standing to seek injunctive relief.").

Despite this, the district court concluded that Plaintiffs did not have standing to seek injunctive relief because: 1) it reasoned that the Plaintiffs should now know to look at the back label to check for a disclaimer indicating the age for which the Products are intended before relying on the front label nutrient content claims and 2) "plaintiffs have not shown or even alleged that they still have children under two

or that they plan to have more children." 1-ER-15. Neither reason supports the court's conclusion that Plaintiffs lack standing to seek injunctive relief.

*Davidson* forecloses the conclusion that Plaintiffs do not have standing because of a back label disclaimer. In reaching the conclusion that a "previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false," this Court relied on *Ries v. Arizona Iced Tea*. *See Davidson*, 889 F.3d at 969. The *Ries* plaintiffs were allowed to seek an injunction against the "All Natural" representations even though high fructose corn syrup and citric acid, the ingredients that rendered the "all natural" claim false and misleading, were listed on the products' ingredient list. *Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012) ("Should plaintiffs encounter the denomination 'All Natural' on an AriZona beverage at the grocery store today, they could not rely on that representation with any confidence. This is the harm California's consumer protection statutes are designed to redress."). Put differently, this Court held that the ability to fact-check a front label claim by looking at the back does not change the cognizable informational injury a plaintiff plausibly suffers when confronting front label claims while shopping.

The district further concluded that "the plaintiffs have not shown or even alleged that they still have children under two or that they plan to have more

children—making it even less likely that they will want to repurchase the products for children under two, or be misled about the products' suitability for their children." 1-ER-15.

Preliminarily, once again, being misled is not a requirement for Plaintiffs' UCL unlawfulness claims. If they would purchase the Products again, that it is sufficient. They have all alleged and testified that they would.

To the extent more is required for a plaintiff to have standing to pursue claims related to baby products, the Supreme Court has recognized that "some claims are so inherently transitory" that they could escape review on the basis of standing for injunctive relief. In those circumstances, the Court held that the "relation back" doctrine is "properly invoked" to confer standing. *Cnty. of Riverside*, 500 U.S. at 52. In *Riverside*, the Court addressed a plaintiff's claim seeking injunctive relief on behalf of himself and "all others similarly situated." *Id*. at 48. When plaintiff filed the complaint, he was incarcerated and had not received a probable cause determination; he sought injunctive relief to require the probably cause determination. *Id*. While the case was pending, plaintiff received a probable cause determination and was released. *Id*. The County moved to dismiss the complaint, asserting that plaintiff lacked standing to bring the suit because he had failed to show that he would again be subject to the allegedly unconstitutional conduct—*i.e.*, a warrantless detention without a probable cause determination. *Id*. The Court held

that plaintiff had standing to pursue injunctive relief because the claim was "inherently transitory." *Id*. at 51–52.

The same is true here. Just because the natural march of time has allowed Plaintiffs' children to grow older than two does not mean that standing should be denied. The passage of time and unknowing future of childbearing plans renders these claims "inherently transitory." Plaintiffs' claims for injunctive relief sufficiently relate back to the injuries they sustained when purchasing Defendant's unlawfully labeled Products, and therefore Plaintiffs have standing to pursue injunctive relief.

## VIII. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court reverse and remand to the district court for further proceedings.

Respectfully submitted this 22nd day of October, 2025

No. 25-1919

**GUTRIDE SAFIER LLP**

*/s/Hayley A. Reynolds/s/*
Seth A. Safier
Matthew T. McCrary
Hayley A. Reynolds

*Attorneys for Plaintiffs-Appellants*

No. 25-1919

## CERTIFICATE OF COMPLIANCE

Pursuant to the Federal Rules of Appellate Procedure, Rule 32(a)(7)(c), I hereby certify that the foregoing brief of Plaintiffs-Appellants complies with the word count limitation of Circuit Rule 32-1(a). There are 13,784 words in the brief according to the word count function of Microsoft Word for Mac version 16.98, the word-processing program used to prepare the brief.

Respectfully submitted this 22nd day of October, 2025.

**GUTRIDE SAFIER LLP**

*/s/Hayley A. Reynolds/s/*
Seth A. Safier
Matthew T. McCrary
Hayley A. Reynolds

*Attorneys for Plaintiffs-Appellants*

No. 25-1919

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the Plaintiffs-Appellants' Opening Brief and Excerpts of Record with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system on October 22, 2025. I certify that all participants in the case who are registered CM/ECF users will be served by that system. I certify that all sealed documents will be served by email on all participants in the case.

Dated this 22nd day of October, 2025.

**GUTRIDE SAFIER LLP**

*/s/Hayley A. Reynolds/s/*
Seth A. Safier
Matthew T. McCrary
Hayley A. Reynolds

*Attorneys for Plaintiffs-Appellants*

# ADDENDUM

# 21 CFR 101.13

This document is current through the October 21, 2025 issue of the Federal Register, with the exception of the amendments appearing at 90 FR 48397.



## § 101.13 Nutrient content claims—general principles.

**(a)** This section and the regulations in subpart D of this part apply to foods that are intended for human consumption and that are offered for sale, including conventional foods and dietary supplements.

**(b)** A claim that expressly or implicitly characterizes the level of a nutrient of the type required to be in nutrition labeling under § 101.9 or under § 101.36 (that is, a nutrient content claim) may not be made on the label or in labeling of foods unless the claim is made in accordance with this regulation and with the applicable regulations in subpart D of this part or in part 105 or part 107 of this chapter.

**(1)** An expressed nutrient content claim is any direct statement about the level (or range) of a nutrient in the food, e.g., "low sodium" or "contains 100 calories."

**(2)** An implied nutrient content claim is any claim that:

**(i)** Describes the food or an ingredient therein in a manner that suggests that a nutrient is absent or present in a certain amount (e.g., "high in oat bran"); or

**(ii)** Suggests that a food, because of its nutrient content, may be useful in maintaining healthy dietary practices, where there is also implied or explicit information about the nutrition content of the food (e.g., "healthy").

**(3)** Except for claims regarding vitamins and minerals described in paragraph (q)(3) of this section, no nutrient content claims may be made on food intended specifically for use by infants and children less than 2 years of age unless the claim is specifically provided for in parts 101, 105, or 107 of this chapter.

**(4)** Reasonable variations in the spelling of the terms defined in part 101 and their synonyms are permitted provided these variations are not misleading (e.g., "hi" or "lo").

**(5)** For dietary supplements, claims for calories, fat, saturated fat, and cholesterol may not be made on products that meet the criteria in § 101.60(b)(1) or (b)(2) for "calorie free" or "low calorie" claims, except, in the case of calorie claims, when an equivalent amount of a similar dietary supplement (e.g., another protein supplement) that the labeled food resembles and for which it substitutes, normally exceeds the definition for "low calorie" in § 101.60(b)(2).

**(c)** Information that is required or permitted by § 101.9 or § 101.36, as applicable, to be declared in nutrition labeling, and that appears as part of the nutrition label, is not a nutrient content claim and is not subject to the requirements of this section. If such information is declared elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirements for nutrient content claims.

**(d)** A "substitute" food is one that may be used interchangeably with another food that it resembles, i.e., that it is organoleptically, physically, and functionally (including shelf life) similar to, and that it is not nutritionally inferior to unless it is labeled as an "imitation."

**(1)** If there is a difference in performance characteristics that materially limits the use of the food, the food may still be considered a substitute if the label includes a disclaimer adjacent to the most prominent claim as defined in paragraph (j)(2)(iii) of this section, informing the consumer of such difference (e.g., "not recommended for frying").

**(2)** This disclaimer shall be in easily legible print or type and in a size no less than that required by § 101.7(i) for the net quantity of contents statement, except where the size of the claim is less than two times the required size of the net quantity of contents statement, in which case the disclaimer shall be no less than one-half the size of the claim but no smaller than one-sixteenth of an inch, unless the package complies with § 101.2(c)(5), in which case the disclaimer may be in type of not less than one thirty-second of an inch.

**(e)**

**(1)** Because the use of a "free" or "low" claim before the name of a food implies that the food differs from other foods of the same type by virtue of its having a lower amount of the nutrient, only foods that have been specially processed, altered, formulated, or reformulated so as to lower the amount of the nutrient in the food, remove the nutrient from the food, or not include the nutrient in the food, may bear such a claim (e.g., "low sodium potato chips").

**(2)** Any claim for the absence of a nutrient in a food, or that a food is low in a nutrient when the food has not been specially processed, altered, formulated, or reformulated to qualify for that claim shall indicate that the food inherently meets the criteria and shall clearly refer to all foods of that type and not merely to the

particular brand to which the labeling attaches (e.g., “corn oil, a sodium-free food”).

**(f)** A nutrient content claim shall be in type size no larger than two times the statement of identity and shall not be unduly prominent in type style compared to the statement of identity.

**(g)** [Reserved]

**(h)**

**(1)** If a food, except a meal product as defined in § 101.13(l), a main dish product as defined in § 101.13(m), or food intended specifically for use by infants and children less than 2 years of age, contains more than 13.0 g of fat, 4.0 g of saturated fat, 60 milligrams (mg) of cholesterol, or 480 mg of sodium per reference amount customarily consumed, per labeled serving, or, for a food with a reference amount customarily consumed of 30 g or less or 2 tablespoons or less, per 50 g (for dehydrated foods that must be reconstituted before typical consumption with water or a diluent containing an insignificant amount, as defined in § 101.9(f)(1), of all nutrients per reference amount customarily consumed, the per 50 g criterion refers to the “as prepared” form), then that food must bear a statement disclosing that the nutrient exceeding the specified level is present in the food as follows: “See nutrition information for ____ content” with the blank filled in with the identity of the nutrient exceeding the specified level, e.g., “See nutrition information for fat content.”

**(2)** If a food is a meal product as defined in § 101.13(l), and contains more than 26 g of fat, 8.0 g of saturated fat, 120 mg of cholesterol, or 960 mg of sodium per labeled serving, then that food must disclose, in accordance with the requirements as provided in paragraph (h)(1) of this section, that the nutrient exceeding the specified level is present in the food.

**(3)** If a food is a main dish product as defined in § 101.13(m), and contains more than 19.5 g of fat, 6.0 g of saturated fat, 90 mg of cholesterol, or 720 mg of sodium per labeled serving, then that food must disclose, in accordance with the requirements as provided in paragraph (h)(1) of this section, that the nutrient exceeding the specified level is present in the food.

**(4)**

**(i)** The disclosure statement “See nutrition information for ____ content” shall be in easily legible boldface print or type, in distinct contrast to other printed or graphic matter, and in a size no less than that required by § 101.7(i) for the net quantity of contents statement, except where the size of the claim is less than two times the required size of the net quantity of contents statement, in

which case the disclosure statement shall be no less than one-half the size of the claim but no smaller than one-sixteenth of an inch, unless the package complies with § 101.2(c)(2), in which case the disclosure statement may be in type of not less than one thirty-second of an inch.

**(ii)** The disclosure statement shall be immediately adjacent to the nutrient content claim and may have no intervening material other than, if applicable, other information in the statement of identity or any other information that is required to be presented with the claim under this section (e.g., see paragraph (j)(2) of this section) or under a regulation in subpart D of this part (e.g., see §§ 101.54 and 101.62). If the nutrient content claim appears on more than one panel of the label, the disclosure statement shall be adjacent to the claim on each panel except for the panel that bears the nutrition information where it may be omitted.

**(iii)** If a single panel of a food label or labeling contains multiple nutrient content claims or a single claim repeated several times, a single disclosure statement may be made. The statement shall be adjacent to the claim that is printed in the largest type on that panel.

**(i)** Except as provided in § 101.9 or § 101.36, as applicable, or in paragraph (q)(3) of this section, the label or labeling of a product may contain a statement about the amount or percentage of a nutrient if:

**(1)** The use of the statement on the food implicitly characterizes the level of the nutrient in the food and is consistent with a definition for a claim, as provided in subpart D of this part, for the nutrient that the label addresses. Such a claim might be, "less than 3 g of fat per serving;"

**(2)** The use of the statement on the food implicitly characterizes the level of the nutrient in the food and is not consistent with such a definition, but the label carries a disclaimer adjacent to the statement that the food is not "low" in or a "good source" of the nutrient, such as "only 200 mg sodium per serving, not a low sodium food." The disclaimer must be in easily legible print or type and in a size no less than that required by § 101.7(i) for the net quantity of contents statement except where the size of the claim is less than two times the required size of the net quantity of contents statement, in which case the disclaimer shall be no less than one-half the size of the claim but no smaller than one-sixteenth of an inch unless the package complies with § 101.2(c)(5), in which case the disclaimer may be in type of not less than one thirty-second of an inch, or

**(3)** The statement does not in any way implicitly characterize the level of the nutrient in the food and it is not false or misleading in any respect (e.g., "100 calories" or "5 grams of fat"), in which case no disclaimer is required.

**(4)** “Percent fat free” claims are not authorized by this paragraph. Such claims shall comply with § 101.62(b)(6).

**(j)** A food may bear a statement that compares the level of a nutrient in the food with the level of a nutrient in a reference food. These statements shall be known as “relative claims” and include “light,” “reduced,” “less” (or “fewer”), and “more” claims.

**(1)** To bear a relative claim about the level of a nutrient, the amount of that nutrient in the food must be compared to an amount of nutrient in an appropriate reference food as specified below.

**(i)**

**(A)** For “less” (or “fewer”) and “more” claims, the reference food may be a dissimilar food within a product category that can generally be substituted for one another in the diet (e.g., potato chips as reference for pretzels, orange juice as a reference for vitamin C tablets) or a similar food (e.g., potato chips as reference for potato chips, one brand of multivitamin as reference for another brand of multivitamin).

**(B)** For “light,” “reduced,” “added,” “extra,” “plus,” “fortified,” and “enriched” claims, the reference food shall be a similar food (e.g., potato chips as a reference for potato chips, one brand of multivitamin for another brand of multivitamin), and

**(ii)**

**(A)** For “light” claims, the reference food shall be representative of the type of food that includes the product that bears the claim. The nutrient value for the reference food shall be representative of a broad base of foods of that type; e.g., a value in a representative, valid data base; an average value determined from the top three national (or regional) brands, a market basket norm; or, where its nutrient value is representative of the food type, a market leader. Firms using such a reference nutrient value as a basis for a claim, are required to provide specific information upon which the nutrient value was derived, on request, to consumers and appropriate regulatory officials.

**(B)** For relative claims other than “light,” including “less” and “more” claims, the reference food may be the same as that provided for “light” in paragraph (j)(1)(ii)(A) of this section, or it may be the manufacturer’s regular product, or that of another manufacturer, that has been offered for sale to the public on a regular basis for a substantial period of time in the same geographic area by the same business entity or by one entitled to use its trade name. The nutrient values used to determine the claim when

comparing a single manufacturer's product to the labeled product shall be either the values declared in nutrition labeling or the actual nutrient values, provided that the resulting label is internally consistent to (i.e., that the values stated in the nutrition information, the nutrient values in the accompanying information and the declaration of the percentage of nutrient by which the food has been modified are consistent and will not cause consumer confusion when compared), and that the actual modification is at least equal to the percentage specified in the definition of the claim.

**(2)** For foods bearing relative claims:

**(i)** The label or labeling must state the identity of the reference food and the percentage (or fraction) of the amount of the nutrient in the reference food by which the nutrient in the labeled food differs (e.g., "50 percent less fat than (reference food)" or "⅓ fewer calories than (reference food)"),

**(ii)** This information shall be immediately adjacent to the most prominent claim. The type size shall be in accordance with paragraph (h)(4)(i) of this section.

**(iii)** The determination of which use of the claim is in the most prominent location on the label or labeling will be made based on the following factors, considered in order:

**(A)** A claim on the principal display panel adjacent to the statement of identity;

**(B)** A claim elsewhere on the principal display panel;

**(C)** A claim on the information panel; or

**(D)** A claim elsewhere on the label or labeling.

**(iv)** The label or labeling must also bear:

**(A)** Clear and concise quantitative information comparing the amount of the subject nutrient in the product per labeled serving with that in the reference food; and

**(B)** This statement shall appear adjacent to the most prominent claim or to the nutrition label, except that if the nutrition label is on the information panel, the quantitative information may be located elsewhere on the information panel in accordance with § 101.2.

**(3)** A relative claim for decreased levels of a nutrient may not be made on the label or in labeling of a food if the nutrient content of the reference food meets the requirement for a "low" claim for that nutrient (e.g., 3 g fat or less).

**(k)** The term "modified" may be used in the statement of identity of a food that bears a relative claim that complies with the requirements of this part, followed immediately by the name of the nutrient whose content has been altered (e.g., "Modified fat cheesecake"). This statement of identity must be immediately followed by the comparative statement such as "Contains 35 percent less fat than ______." The label or labeling must also bear the information required by paragraph (j)(2) of this section in the manner prescribed.

**(*l*)** For purposes of making a claim, a "meal product shall be defined as a food that:

**(1)** Makes a major contribution to the total diet by:

**(i)** Weighing at least 10 ounces (oz) per labeled serving; and

**(ii)** Containing not less than three 40-g portions of food, or combinations of foods, from two or more of the following four food groups, except as noted in paragraph (l)(1)(ii)(E) of this section.

**(A)** Bread, cereal, rice, and pasta group;

**(B)** Fruits and vegetables group;

**(C)** Milk, yogurt, and cheese group;

**(D)** Meat, poultry, fish, dry beans, eggs, and nuts group; except that;

**(E)** These foods shall not be sauces (except for foods in the above four food groups that are in the sauces), gravies, condiments, relishes, pickles, olives, jams, jellies, syrups, breadings or garnishes; and

**(2)** Is represented as, or is in a form commonly understood to be, a breakfast, lunch, dinner, or meal. Such representations may be made either by statements, photographs, or vignettes.

**(m)** For purposes of making a claim, a "main dish product" shall be defined as a food that:

**(1)** Makes a major contribution to a meal by

**(i)** Weighing at least 6 oz per labeled serving; and

**(ii)** Containing not less than 40 g of food, or combinations of foods, from each of at least two of the following four food groups, except as noted in paragraph (m)(1)(ii)(E) of this section.

**(A)** Bread, cereal, rice, and pasta group;

**(B)** Fruits and vegetables group;

**(C)** Milk, yogurt, and cheese group;

**(D)** Meat, poultry, fish, dry beans, eggs, and nuts groups; except that:

**(E)** These foods shall not be sauces (except for foods in the above four food groups that are in the sauces) gravies, condiments, relishes, pickles, olives, jams, jellies, syrups, breadings, or garnishes; and

**(2)** Is represented as, or is in a form commonly understood to be, a main dish (e.g, not a beverage or a dessert). Such representations may be made either by statements, photographs, or vignettes.

**(n)** Nutrition labeling in accordance with § 101.9, § 101.10, or § 101.36, as applicable, shall be provided for any food for which a nutrient content claim is made.

**(o)** Except as provided in § 101.10, compliance with requirements for nutrient content claims in this section and in the regulations in subpart D of this part, will be determined using the analytical methodology prescribed for determining compliance with nutrition labeling in § 101.9.

**(p)**

**(1)** Unless otherwise specified, the reference amount customarily consumed set forth in § 101.12(b) through (f) shall be used in determining whether a product meets the criteria for a nutrient content claim. If the serving size declared on the product label differs from the reference amount customarily consumed, and the amount of the nutrient contained in the labeled serving does not meet the maximum or minimum amount criterion in the definition for the descriptor for that nutrient, the claim shall be followed by the criteria for the claim as required by § 101.12(g) (e.g., "very low sodium, 35 mg or less per 240 milliliters (8 fl oz.)").

**(2)** The criteria for the claim shall be immediately adjacent to the most prominent claim in easily legible print or type and in a size in accordance with paragraph (h)(4)(i) of this section.

**(q)** The following exemptions apply:

**(1)** Nutrient content claims that have not been defined by regulation and that are contained in the brand name of a specific food product that was the brand name in use on such food before October 25, 1989, may continue to be used as part of that brand name for such product, provided that they are not false or misleading under section 403(a) of the Federal Food, Drug, and Cosmetic Act (the act). However, foods bearing such claims must comply with section 403(f), (g), and (h) of the act;

**(2)** A soft drink that used the term "diet" as part of its brand name before October 25, 1989, and whose use of that term was in compliance with § 105.66 of this chapter as that regulation appeared in the Code of Federal Regulations on that date, may continue to use that term as part of its brand name, provided that its use

of the term is not false or misleading under section 403(a) of the act. Such claims are exempt from the requirements of section 403(r)(2) of the act (e.g., the disclosure statement also required by § 101.13(h)). Soft drinks marketed after October 25, 1989, may use the term "diet" provided they are in compliance with the current § 105.66 of this chapter and the requirements of § 101.13.

**(3)**

**(i)** A statement that describes the percentage of a vitamin or mineral in the food, including foods intended specifically for use by infants and children less than 2 years of age, in relation to a Reference Daily Intake (RDI) as defined in § 101.9 may be made on the label or in labeling of a food without a regulation authorizing such a claim for a specific vitamin or mineral unless such claim is expressly prohibited by regulation under section 403(r)(2)(A)(vi) of the act.

**(ii)** Percentage claims for dietary supplements. Under section 403(r)(2)(F) of the act, a statement that characterizes the percentage level of a dietary ingredient for which a reference daily intake (RDI) or daily reference value (DRV) has not been established may be made on the label or in labeling of dietary supplements without a regulation that specifically defines such a statement. All such claims shall be accompanied by any disclosure statement required under paragraph (h) of this section.

**(A)** Simple percentage claims. Whenever a statement is made that characterizes the percentage level of a dietary ingredient for which there is no RDI or DRV, the statement of the actual amount of the dietary ingredient per serving shall be declared next to the percentage statement (e.g., "40 percent omega-3 fatty acids, 10 mg per capsule").

**(B)** Comparative percentage claims. Whenever a statement is made that characterizes the percentage level of a dietary ingredient for which there is no RDI or DRV and the statement draws a comparison to the amount of the dietary ingredient in a reference food, the reference food shall be clearly identified, the amount of that food shall be identified, and the information on the actual amount of the dietary ingredient in both foods shall be declared in accordance with paragraph (j)(2)(iv) of this section (e.g., "twice the omega-3 fatty acids per capsule (80 mg) as in 100 mg of menhaden oil (40 mg)").

**(4)** The requirements of this section do not apply to:

**(i)** Infant formulas subject to section 412(h) of the act; and

**(ii)** Medical foods defined by section 5(b) of the Orphan Drug Act.

**(5)** A nutrient content claim used on food that is served in restaurants or other establishments in which food is served for immediate human consumption or which is sold for sale or use in such establishments shall comply with the requirements of this section and the appropriate definition in subpart D of this part, except that:

**(i)** Such claim is exempt from the requirements for disclosure statements in paragraph (h) of this section and §§ 101.54(d), 101.62(c), (d)(1)(ii)(D), (d)(2)(iii)(C), (d)(3), (d)(4)(ii)(C), and (d)(5)(ii)(C); and

**(ii)** In lieu of analytical testing, compliance may be determined using a reasonable basis for concluding that the food that bears the claim meets the definition for the claim. This reasonable basis may derive from recognized data bases for raw and processed foods, recipes, and other means to compute nutrient levels in the foods or meals and may be used provided reasonable steps are taken to ensure that the method of preparation adheres to the factors on which the reasonable basis was determined (e.g., types and amounts of ingredients, cooking temperatures, etc.). Firms making claims on foods based on this reasonable basis criterion are required to provide to appropriate regulatory officials on request the specific information on which their determination is based and reasonable assurance of operational adherence to the preparation methods or other basis for the claim; and

**(iii)** A term or symbol that may in some contexts constitute a claim under this section may be used, provided that the use of the term or symbol does not characterize the level of a nutrient, and a statement that clearly explains the basis for the use of the term or symbol is prominently displayed and does not characterize the level of a nutrient. For example, a term such as “lite fare” followed by an asterisk referring to a note that makes clear that in this restaurant “lite fare” means smaller portion sizes than normal; or an item bearing a symbol referring to a note that makes clear that this item meets the criteria for the dietary guidance established by a recognized dietary authority would not be considered a nutrient content claim under § 101.13.

**(6)** Nutrient content claims that were part of the common or usual names of foods that were subject to a standard of identity on November 8, 1990, are not subject to the requirements of paragraphs (b) and (h) of this section or to definitions in subpart D of this part.

**(7)** Implied nutrient content claims may be used as part of a brand name, provided that the use of the claim has been authorized by the Food and Drug Administration. Petitions requesting approval of such a claim may be submitted under § 101.69(o).

**(8)** The term fluoridated, fluoride added or with added fluoride may be used on the label or in labeling of bottled water that contains added fluoride.

## Statutory Authority

Authority Note Applicable to 21 CFR Ch. I, Subch. B, Pt. 101

## History

[56 FR 60469, Nov. 27, 1991, revoked at 58 FR 2069, Jan. 1, 1993; 58 FR 2410, Jan. 6, 1991, as corrected at 58 FR 17342, April 2, 1993; 58 FR 44030, Aug. 18, 1993; 59 FR 393, Jan. 4, 1994, as corrected at 59 FR 15051, March 31, 1994; 60 FR 7711, Feb. 9, 1995; 60 FR 17205, April 5, 1995; 61 FR 11730, 11731, March 22, 1996; 61 FR 40320, 40332, Aug. 2, 1996, as corrected at 61 FR 67451, 67452, Dec. 23, 1996; 62 FR 31338, 31339, June 9, 1997; 62 FR 49859, 49867, Sept. 23, 1997; 63 FR 14817, 14818, March 27, 1998; 63 FR 26978, 26980, May 15, 1998; 81 FR 59129, 59131, Aug. 29, 2016; 89 FR 106064, 106162, Dec. 27, 2024; 90 FR 10592, Feb. 25, 2025]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2025 All rights reserved.